UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Jeanne Grivois

    v.                                     Civil No. 12-cv-131-JL
                                           Opinion No. 2014 DNH 017
Wentworth-Douglass Hospital
and Gregory Walker


**MEMORANDUM ORDER**

The central question in the case, like in many employment
cases, turns on why the defendant fired the plaintiff--a question
of state of mind that, while it does not necessarily preclude the
remedy of summary judgment, see Fed. R. Civ. P. 56, calls for
"particular cautio[n]" in its application. Stepanischen v.
Merchants Despatch Transp. Co., 722 F.2d 922, 927 (1st Cir.
1983). The record in this case, like the record in many
employment cases, is characterized by disputes over who said what
to whom, and when, as interested witnesses have given their
recollections of largely undocumented interactions that occurred
several years ago. None of that, though, has stopped the
defendant employer here--like the employer in many employment
cases--from moving for summary judgment, arguing that the
undisputed record evidence shows that it did not fire the
plaintiff for, as she claims, performing acts that public policy
would encourage.

Specifically, the plaintiff, Jeanne Grivois, claims that the defendant, Wentworth-Douglass Hospital, wrongfully terminated her for engaging in acts that public policy would encourage--her "expression of concern about Hospital policies which she believed had created the potential of harm to Hospital patients"--in violation of New Hampshire law.  See Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 920 (1981).  Grivois has also sued the hospital's president and CEO, Gregory Walker, claiming that he defamed her when he told surgeons who had worked with her that she was "fired for engaging in a 'heinous act.'"  The defendants have moved for summary judgment on that claim, too, as well as to exclude or limit the trial testimony of several of Grivois's expert witnesses.

Grivois, for her part, has filed a motion to amend her complaint, see Fed. R. Civ. P. 15(a)(2), seeking to add claims based on Walker's statement and the statement of another hospital employee who, Walker says, erroneously told him that Grivois had been fired for threatening to publicly say that her supervisor is gay (which the supervisor denies).  This court has subject-matter jurisdiction under 28 U.S.C.        § 1332(a)(1) (diversity), because Grivois is a citizen of Maine and Wentworth-Douglass and Walker are citizens of New Hampshire.

Following oral argument, the defendants' motion for summary judgment is denied, their motion to exclude or limit the testimony of Grivois's designated expert witnesses is granted in part and denied in part, and Grivois's motion to amend is denied. In moving for summary judgment on Grivois's wrongful discharge claim, the defendants argue that (1) her mere "'expressions of concern' that changes in training or different staffing patterns could create a potential risk to patient safety . . . were not, as a matter of law, protected acts," (2) in any event, Grivois lacks evidence that she was fired for expressing those concerns, as opposed to the unrelated reason that the hospital gave for firing her, and (3) Grivois likewise lacks evidence that she was fired "out of bad faith, malice, or retaliation," which she must also prove to prevail on her wrongful termination claim, Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1992).  As fully explained below, see infra Part I.C.1, the court disagrees. Based on the record evidence (much of which the defendants have failed to address or glossed over in their briefing), a rational jury could find that (1) public policy encouraged Grivois to complain to her managers that their changes to training and staffing procedures had endangered patient safety, (2) the hospital fired Grivois for making such complaints, and (3) it acted out of bad faith, malice, or retaliation in doing so.  As

also fully explained below, the defendants are incorrect that Walker's statement that Grivois had been fired for (as one witness remembers the statement) "a heinous crime" was either inactionable or privileged as a matter of law.  See infra Part I.C.2.  The motion for summary judgment is denied.

Grivois's motion to amend is also denied, because, as fully discussed below, she filed it several months after the applicable deadline and has failed to show good cause for that delay.  See infra Part II.  Finally, the defendants' motion to exclude or limit the opinion testimony of Grivois's designated experts is denied insofar as it is based on the alleged untimeliness of her expert disclosures, see infra Part III.A, but is granted in part and denied in part insofar as the motion argues that the opinions are inadmissible, see infra Part III.B.  The court will address the various motions in turn.

## I.   Summary judgment

### A.   Applicable legal standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial by a rational fact-

4

finder, and "material" if it could sway the outcome under
applicable law.  See Estrada v. Rhode Island, 594 F.3d 56, 62
(1st Cir. 2010).  Importantly, in deciding summary judgment, the
court "views all facts and draws all reasonable inferences in the
light most favorable to the non-moving" party.  Id.

## B.   Background

The facts relevant to the defendants' summary judgment
motion, set forth in the light most favorable to Grivois, are as
follows.[1]  Grivois began working for Wentworth-Douglass as a

---

[1]Invoking L.R. 7.2(b)(2), the defendants argue that all of
the properly supported material facts set forth in their summary
judgment memorandum are deemed admitted because Grivois has not
"properly opposed" them in her opposition memorandum--a task
which, in the defendants' view, required her to "identify . . .
which of the [their] properly supported material facts [she]
contends are either not material or are not disputed by her."
Local Rule 7.2(b)(2), however, does not envision the non-movant's
version of facts as a response to the movant's version; the rule
requires only that the opposition memorandum "incorporate a short
and concise statement of material facts, supported by appropriate
record citations, as to which the adverse party contends a
genuine dispute exists as to require a trial."  In other words,
L.R. 7.2(b)(2) simply directs the non-movant to "set forth, with
specificity, her own version of the material facts," accompanied
by citations to the record.  Lagasse v. McLane/E., Inc., No.
12-cv-240, slip op. at 3 (D.N.H. Oct. 21, 2013).  Grivois's
summary judgment memorandum does so, and therefore complies with
Local Rule 7.2(b)(2).

This is not to say that Grivois's summary judgment objection
complies with all other rules applicable to those filings, most
notably, Rule 56(c)(2), which requires that "material submitted
to support or dispute a fact . . . be presented in a form that
would be admissible in evidence."  While Grivois cites to certain
admissible materials, such as depositions, affidavits, and

surgical technologist in 1976 and, by the time of the events
giving rise to this lawsuit, was acting as a "service
coordinator" for the hospital's general surgeons.

In 2009, Wentworth-Douglass hired Christine Hamill as its
assistant vice president of surgical and out-patient services, a
position that included oversight of the operating room ("OR").
Hamill, in turn, hired Dale Spracklin as the OR's nurse manager,
in or around June 2010.

### 1. Grivois's complaints to management

Hamill and Spracklin began to implement certain changes to
staffing procedures in the OR.[2]  One of these changes was to

---

interrogatory answers, she also repeatedly cites to her
complaint--which is unverified--as evidence of the facts alleged.
The allegations of an unverified complaint cannot be used to
demonstrate a genuine issue of fact in opposing summary judgment.
See, e.g., Fragoso v. Lopez, 991 F.2d 878, 887 (1st Cir. 1993).
This deficiency is not cured, moreover, by Grivois's submission
of an affidavit stating, in a single sentence, that "the
information contained in [her summary judgment memorandum] is
accurate to the best of [her] knowledge and belief."  See
F.D.I.C. v. Roldan Fonseca, 795 F.2d 1102, 1106 (1st Cir. 1986)
(ruling that an affidavit "to the effect that the facts in a
certain pleading are true to the best of affiant's 'knowledge and
belief' . . . is in no way the evidentiary affidavit called for"
by Rule 56).  In its summary judgment analysis, then, this court
has ignored Grivois's factual assertions insofar as they are
supported only by citations to her complaint.

[2]Prior to Spracklin's arrival, Hamill made a change to the
OR's on-call policy.  Previously, employees over the age of 60
(including Grivois) had been exempt from "on-call" duty.  Hamill
discontinued that exemption.  Grivois formally complained to the

relax the training required for new OR staffers.  Previously, a new staff member could fully assume independent duties in the OR only after completing three months of training <u>and</u> convincing the "operating room educator," Cindy Wyskiel, that the new hire was ready for that responsibility.  If, based on feedback from more experienced staffers, Wyskiel determined otherwise, then the new staffer was not left alone to perform tasks for patients in the OR until he or she demonstrated the necessary proficiency.  After Hamill took over, however, new staffers were given sole responsibility over those tasks solely by virtue of completing the three-month training period.

Grivois says that this led to several situations where patients were unnecessarily exposed to the risk of harm.  She recalls one case of a laparoscopic abdominal surgery in which a new staff person could not readily identify an instrument that the surgeon had requested (a hemoclip), resulting in an

---

human resources department about this change, which she believed was "a safety issue" (though her formal complaint did not say that).  While the complaint in this action mentions that, prior to her firing, Grivois voiced a concern that "at [her] age, being on-call put her at risk for performing her duties with less than adequate competence," she testified at her deposition that she did not believe that the "primary reason" she was fired was that she "complained about being on call," and that she did not believe that her formal complaint played "any part" in her termination.  In ruling on summary judgment, then, the court has not considered any theory that Grivois was fired for complaining about the change to the on-call policy.

interruption to the procedure and, ultimately, the need to remove the laparoscope so that blood could be cleared.  Grivois says that this delay could have increased the potential for infection and tissue morbidity and that "[u]nder the former training procedure, the experienced staff person with whom [the new hire] would have been paired would have prevented this unnecessary delay."  Grivois recalls that, in another case, a new staff member incorrectly positioned the cautery device, causing its foot pedal to jam underneath the operating table so that the device malfunctioned--which occasioned several minutes' delay as the cautery unit was reactivated.  Grivois also recalls another incident in which a new staff member improperly repositioned an obese patient for a procedure, risking nerve damage.

At her deposition, Grivois said that she raised her concerns about the orientation of new staff--specifically, "the fear that something was going to happen to a patient"--to Wyskiel on "several" occasions.  Grivois also testified that she also raised the issue "10, 12, multiple times" with Spracklin, as well as during "a long talk" with Hamill in the late spring of 2010.  In addition, in her answers to the defendants' interrogatories, Grivois states that she told Spracklin "about all of the dangers that [Grivois] witnessed at [her] yearly evaluation," which took place in or around September 2010.

8

Another change that Hamill and Spracklin had started to implement, in the fall of 2010, was to introduce a system called "PODS" (an acronym for "professional of designated speciality"). Under this system, each OR nurse works in just a few specific surgical specialities. This focus, in theory, enables the nurse to better familiarize himself or herself with the procedures common to those specialties. This differs from a more traditional staffing model, in which each nurse is expected to assist with all types of surgery, rather than specializing.

At her deposition, Grivois testified that she "saw flaws in the POD system which [she] stated to" Hamill and Spracklin, telling them that it was "a patient safety issue." Under the PODS regime, as Grivois states in her answers to the defendants' interrogatories, a surgeon "would train people who would then not be in his [operating] room [assisting] for a long time, then he would train more people[,] then when the original people rotated back into his room, they had totally forgotten what he had taught them." Grivois states that "[t]his is not good patient care" because "[i]nexperienced staff make more mistakes." In addition, Grivois states, "[t]he service coordinators are not there" to

guide the inexperienced staff because they "are in other rooms doing other POD services."[3]

### 2.   Grivois's suspension and firing

In September 2010, Hamill and Christi Blanchard, who held the title of "Human Resource Recruitment and Retention Officer" at Wentworth-Douglass, informed Spracklin that two nurses who had recently left the hospital's employ had complained about Grivois during their exit interviews.  These nurses had said that "Grivois was mean to them, did not support the OR staff, and was an overall bad influence in the OR."  Spracklin spoke to both of the nurses, who generally repeated the substance of what they had said in their exit interviews.

In an affidavit submitted with Grivois's objection to the summary judgment motion, Spracklin explains that she "found it easy to believe that people were quitting based on inappropriate behavior by Ms. Grivois," because, among other reasons, Hamill and Blanchard had told Spracklin that "Grivois had a reputation

---

[3]In her interrogatory answers, Grivois describes an incident where she and another coordinator were both assisting with a gynecological procedure, leaving a different surgeon to prepare for another procedure with the help of "3 or 4 new people who had no idea how to position [the] patient for surgery."  As a result, Grivois says, "the patient was unnecessarily repositioned multiple times, putting the patient under physical stress," which "could have been avoided by having a [general surgery] coordinator," such as Grivois, present.

for being a disruptive employee and there were perhaps multiple
written warnings in her personnel file."  In fact, Spracklin
attests, Hamill and Blanchard "led [her] to believe that Ms.
Grivois' complaints about the implementation of the POD system
were just more examples of her disruptive behavior.  I was told
that I should 'get rid of her.'"[4]  Spracklin further attests that
Hamill and Blanchard told her, after Spracklin began working at
Wentworth-Douglass in June 2010, that she "would have difficulty
in implementing changes," due in part to certain employees who
"would be reluctant to change."  Hamill and Blanchard identified
Grivois as "one of those 'trouble' employees."

---

[4]At oral argument, the defendants maintained that this
statement from Spracklin's affidavit--"I was told that I should
just get rid of her"--failed to show that it was Hamill or
Blanchard who had told Spracklin that, presumably because the
statement is couched in the passive voice.  As just discussed,
though, the surrounding paragraphs of Spracklin's affidavit
specifically identify Hamill and Blanchard as the source of other
critical comments about Grivois, so it is at least reasonable to
read the statement as identifying the same people as the source
of the advice to "just get rid of her."  Again, the court must
view the summary judgment in the light most favorable to Grivois,
giving her the benefit of all reasonable inferences.  See Part
I.A, supra.  It is also worth noting that the defendants had a
copy of Spracklin's affidavit prior to her deposition, so they
could have used that opportunity to ask her to clarify her
statement, in hopes of eliminating a potential issue of fact.
But they did not do so, at least in any portion of Spracklin's
deposition that has been submitted to the court.  While the
defendants were of course entitled to leave the record as it
stood on this point, it is the court's view that, on the record
as it stands, the "just get rid of her" comment is fairly
attributable to Hamill or Blanchard.

Spracklin (with the assistance of Hamill and Blanchard) took formal disciplinary action against Grivois, in the form of a "Level II Warning," based on the outgoing nurses' complaints.  At a one-on-one meeting in November 2010), Spracklin presented Grivois with the warning, but she refused to sign it.  In disputing the accuracy of the nurses' complaints, Grivois told Spracklin, according to Spracklin's affidavit:

> I shouldn't believe everything that I heard from OR staffer members.  She then commented that I should hear what OR staff members said about me.

> I asked her what was being said.  She replied that others had said:  that I had been fired from my last job, that I was going through a divorce, and that I was gay.

Spracklin assured Grivois that these stories were untrue. Spracklin then told Hamill what Grivois had said.  On the next working day, Grivois apologized to Spracklin, who said she would be making a formal complaint about Grivois's comments.

To do so, Spracklin met with Erin Flanigan, the vice president of human resources at Wentworth-Douglass, on November 19, 2010.  Flanigan, in turn, notified Grivois of Spracklin's complaint.  When Flanigan met with Grivois, she admitted to making the inappropriate comments to Spracklin.  Flanigan notified Grivois that she was being suspended.

On November 22, 2010, Hamill and Flanigan presented Grivois with written notice that, "[b]ased on [their] investigation of the recent complaint lodged against [her] and [her] admission of said complaint," Grivois was immediately suspended without pay until December 13, 2010, and relieved of her role as the service coordinator for general surgery (she was reassigned to orthopedics). She was also warned that "[i]f improvement in these areas does not occur, further disciplinary action, up to and including termination, may occur." Grivois objected that the punishment was too harsh, and refused to sign the notice, asking for time to decide how to respond. After Flanigan agreed to give Grivois a week, Hamill left the room, and Flanigan asked Grivois whether she would talk to Spracklin. Grivois agreed.

After Spracklin entered, she told Grivois that she was being moved from her position in general surgery to orthopedics, but that "we're going to try to work things out." What happened next is a matter of some dispute. Flanigan has testified that Grivois "moved forward to the edge of her chair and actually leaned forward to" Spracklin to express "disagreement with the process around the Level II Warning" (which, as just discussed, had resulted from the complaints the two outgoing nurses had made about Grivois). In response, Flanigan recalls, Spracklin "got flustered, was actually sitting back, had a flushed face and was

13

kind of looking at [Flanigan] very deer-in-the-headlights."  So
Flanigan "stopped the conversation," because "in the course of a
conversation where her manager was trying to get the employee
focused on the future, it became clear . . . that this was not an
employee who was open to hearing feedback from" Spracklin.

Spracklin's account of the meeting is that "obviously
[Grivois] was upset" and "defensive" at the loss of her role as
the service coordinator for general surgery, and "folded [her]
arms and sighed," but that "[t]he discussion was not heated" and
that neither woman "became argumentative."  Grivois, for her
part, testified that she told Spracklin, "I would admit to
something I did if I did it, but I didn't know what she said that
I did . . . .  I needed to see the complaint."  Grivois stated
that, in giving that message, she "used some hand motion" and may
have been "leaning forward" but did not raise her voice.  Grivois
further recalled that Spracklin "didn't seem flustered."  In
fact, Grivois testified, after Flanigan "stopped the conversation
and said this is going nowhere," Grivois asked Flanigan, "was I
unprofessional in my demanor to [Spracklin] at all?" and Flanigan
said "no, you weren't."

In any event, Flanigan ended the meeting.  She then called
Hamill and reported that Grivois "was not interested in improving
her interpersonal relations with [Spracklin] or with people

14

generally, and so it was [Flanigan's] recommendation that
[Wentworth-Douglass] consider termination."   Hamill agreed, and
decided to fire Grivois.   Spracklin was not consulted further.
On November 23, 2010 (the day after Grivois's meeting with
Flanigan and Spracklin), Hamill and Flanigan notified Grivois
that she was being terminated due to, as Grivois recalls it, her
"failure to move on with [her] supervisor," Spracklin.

   Following Grivois's termination, some of the surgeons with
whom she had worked approached Walker, Wentworth-Douglass's CEO,
seeking to learn why Grivois had been fired.   In a series of
meetings that followed, Walker responded, initially, that he
would not discuss the specific reasons for one employee's
termination with the hospital's other employees.   Eventually,
though, Walker stated--according to one of the surgeons who was
there--that Grivois had "performed a heinous crime."[5]   Walker did
not further elaborate, but has since explained, at his deposition
in this case, that he thought when he made that statement that
Grivois had been fired because she threatened "[t]o go public
with the fact that [Spracklin] had an alleged affair with another

---

[5]Other witnesses recalled that Walker had used the phrase
"heinous act"--which is also what Grivois, in her complaint in
this action, accused Walker of saying.   Again, though, this court
must take the record in the light most favorable to Grivois.

employee" at the hospital where she worked prior to taking her job at Wentworth-Douglass.

### C.   Analysis

#### 1.   Wrongful termination

"In order to prevail on a wrongful termination claim under New Hampshire law, a plaintiff must establish two elements:  one, that the employer terminated the employment out of bad faith, malice, or retaliation; and, two, that the employment was terminated because the employee performed acts which public policy would encourage or refused to perform acts which public policy would condemn." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 44 (1st Cir. 2001) (quotation marks, bracketing, and ellipses omitted).  The defendants argue that they are entitled to summary judgment on Grivois's wrongful termination claim because she cannot show a genuine issue of material fact as either of these elements.  Specifically, the defendants argue that Grivois lacks sufficient proof:

> (a) that she performed any act that public policy would encourage;
>
> (b) even if she did, that Wentworth-Douglass fired her for performing that act, instead of for her conduct at the meeting with Flanigan and Spracklin, in November 2010; and
>
> (c) that, whatever the conduct that prompted Grivois's termination, it was motivated by the bad faith,

16

      retaliation, or malice, as also necessary to give rise
      to a wrongful termination claim.

For the reasons explained below, this court disagrees, and rules

that Grivois has presented a triable claim for wrongful

termination.

          **a.    Acts that public policy would encourage**

    As noted at the outset, Grivois alleges that she was fired

for her "expression of concern about Hospital policies which she

believed had created the potential of harm to Hospital patients."

In moving for summary judgment, the defendants do not dispute

that Grivois generally expressed such concerns--instead, they

argue that "diffuse 'expressions of concern' that changes in

training or different staffing patterns could create a risk to

patient safety, without any basis in established minimum

standards or regulations to support that claim, were not, as a

matter of law, protected acts."  This court disagrees with the

defendants' characterizations of both what Grivois did, as a

matter of fact, and what an employee is required to do, as a

matter of law, to give rise to a wrongful termination claim.

    To start with, neither the New Hampshire Supreme Court nor

this court has ever held that an employee's complaints about

safety risks caused by her employer's operations are "protected

acts" only if those risks result from the violation of

"established minimum standards or regulations."  Cf. Bruning v. D.E. Salmon, Inc., No. 03-352, 2003 WL 22995122, at *2-*3 (D.N.H. Dec. 18, 2003) (denying motion to dismiss wrongful termination claim for the lack of a cognizable public policy where the plaintiff alleged he was fired for complaining about unsafe behavior in the workplace, without discussing whether that behavior violated established standards or regulations); Brewer v. K.W. Thompson Tool Co., 647 F. Supp. 1562, 1565 (D.N.H. 1986) (similar).  To the contrary, "[p]ublic policy exceptions giving rise to wrongful discharge actions may [] be based on non-statutory policies" and determining "[t]he existence of a public policy [] calls for the type of multifaceted balancing process that is properly left to the jury in most instances." Cloutier, 121 N.H. at 922-24.

So far as this court can tell from the existing pronouncements of the New Hampshire Supreme Court, this "multifaceted balancing process" does not impose absolute requirements, such as the one the defendants propose.  The defendants make no attempt to reconcile established New Hampshire law with their view that public policy encourages complaints about workplace safety only when those complaints concern violations of "established minimum standards or regulations."

Instead, the defendants rely on case law rejecting wrongful termination claims under Massachusetts law.  But, while Massachusetts law provides "a cause of action for wrongful discharge if the discharge is contrary to public policy," DeRose v. Putnam Mgmt. Co., 496 N.E.2d 428, 431 (Mass. 1986), Commonwealth law in this area differs from that of this state in at least one crucial respect.  As Grivois points out, Massachusetts recognizes "a cause of action for wrongful termination only if the termination violates a <u>clearly established</u> public policy," and "has consistently interpreted the public policy exception narrowly." King v. Driscoll, 638 N.E.2d 488, 492 (Mass. 1994) (emphasis added).

Thus, Massachusetts courts have generally restricted wrongful termination claims to "employees who are terminated for asserting a legal right, for doing what the law requires, or for refusing to disobey the law," and to a few other "reasons for terminations which would directly contradict well-defined public policies of the Commonwealth." Upton v. JWP Businessland, 682 N.E.2d 1357, 1358-59 (Mass. 1997) (parentheticals omitted).  The New Hampshire Supreme Court, in contrast, has explicitly refused to limit wrongful termination claims to firings that implicate "a strong and clear public policy," and, again, has left identifying

19

the existence of a public policy to juries applying a "multifaceted balancing process," Cloutier, 121 N.H. at 923-24.[6] In light of this important difference between the Massachusetts and New Hampshire doctrines of wrongful termination, this court is not persuaded by the Massachusetts decisions that the defendants have cited in support of their summary judgment motion, even though two of those cases arose out of circumstances quite similar to those presented here.  See Wright v. Shriners Hosp. for Crippled Children, 589 N.E.2d 1241 (Mass. 1992); Smith-Pfeffer v. Superintendent of Walter E. Fernald State Sch., 533 N.E.2d 1368 (Mass. 1989).

Like Grivois, the plaintiff in Wright provided patient care in a hospital, as a nurse, and claimed that she had been wrongfully terminated "in retaliation for her having criticized the hospital, specifically in regard to the quality of care rendered to patients, to [its] national headquarters survey team." 589 N.E.2d 1243-44.  Rejecting that claim, the Supreme Judicial Court held, as a matter of law, that firing the plaintiff for such remarks "would not have violated public

---

[6]Indeed, in so holding, the court rejected the opinion of a dissenting justice that "an employee at-will may be discharged with or without cause, unless he identifies a specific expression of clear public policy." Cloutier, 121 N.H. at 926 (Bois, J., dissenting).

policy," id., relying heavily on the absence "of any statute that clearly expresses a legislative policy to encourage nurses to make the kind of internal report involved in this case," id. at 1244. But, as just discussed, the public policy supporting a wrongful termination claim under New Hampshire law does not require a statutory source, let alone one that "clearly expresses" the policy in question, see Cloutier, 121 N.H. at 923-24, so Wright provides little guidance here.

The same is true of Smith-Pfeffer, the case of a medical director at a state school for the mentally disabled who claimed she was wrongfully terminated after she criticized plans to reorganize the school in a way that would "compromise service delivery to the residents." 533 N.E.2d at 1370. In affirming a directed verdict for the school, the court noted that the plaintiff did not claim that her actions fit within any of the limited categories of conduct (listed above) that can support a wrongful discharge claim under Massachusetts law, and refused to recognize a public policy protecting employees for "performing appropriate, socially desirable duties." Id. at 1371. Again, New Hampshire takes a more flexible view of the public policies that can ground a wrongful termination claim and, in any event, Grivois does not claim that she was fired merely for "performing appropriate, socially desirable duties."

21

Rather, Grivois says that she was fired for complaining about new Wentworth-Douglass "policies which she believed had created the potential of harm to Hospital patients."  The defendants do not question that, applying New Hampshire law, a rational fact-finder could conclude that public policy encourages an employee at a hospital or similar facility to raise concerns about risks to patient safety.  In fact, the defendants agree that such a policy could be found to exist, so long as the risks "pose a direct or imminent threat to patient safety."  Again, though, the defendants do not provide any New Hampshire case law that imposes such a limitation, or any analogous one, on the kinds of public policy that can support a wrongful termination claim, and, once again, their suggestion is at odds with the "multifaceted" approach adopted in Cloutier.

But even assuming, for the sake of argument, that New Hampshire law imposes this highly specific requirement, Grivois meets it, at least when the summary judgment record is taken in the light most favorable to her.  As discussed supra, Grivois testified that she "saw flaws in the POD system which [she] stated to" Hamill, telling her that it was "a patient safety issue."  Grivois also testified that she raised her "fear that something was going to happen to a patient" as a result of the

relaxed training requirements during "a long talk" with Hamill.[7]
Despite the defendants' urging, this court is unwilling to
characterize an employee's warnings that inadequate training or
staffing in a hospital operating room could result in physical
harm to a patient as presenting a safety threat that is
insufficiently "direct" or "imminent" to implicate public policy
as a matter of law.

In this court's view, then, this case does not raise the
potential problem--identified by the Massachusetts Supreme
Judicial Court in Wright--of wrongful discharge claims by health
care workers who fail to define their protected conduct any more
specifically than "reporting on issues they feel are detrimental
to health care." 589 N.E.2d at 1245.  Again, the summary
judgment record permits the conclusion that, at a minimum,
Grivois told Hamill of specific training and staffing policies

---

[7]Grivois also attests that, at her evaluation in September
2010, she told Spracklin "about all of the dangers that [Grivois]
witnessed," including, as discussed above, three specific
incidents where a patient was exposed to an additional risk of
complications due to the inadequate training of OR staff
following the changes put in place by Hamill and Spracklin.  The
summary judgment record arguably supports a reasonable inference
that Grivois also referenced those incidents during her "long
talk" with Hamill, but the court need not decide that because, as
just explained, a jury could conclude that public policy
encouraged Grivois to complain to Hamill that the changes in OR
staffing and training threatened patient safety, even if Grivois
did not provide examples of cases where that had happened.

that had jeopardized patient safety.  That is sufficient to create a triable issue as to whether Grivois engaged in conduct that public policy would encourage under New Hampshire law.

The defendants also suggest that Grivois's wrongful termination claim fails precisely because it is premised on her complaints about changes to OR training and staffing policies, since "an employee's disagreement with management decisions, including those involving the implementation or enforcement of internal policies, is not, without more, protected by public policy."  Here, however, there is "more," because (at least on one permissible view of the evidence) some of the "management decisions" and "internal policies" at issue put patients at greater risk of complications, which was the reason Grivois gave for voicing her disagreement with them.

That fact, which a rational jury could find, distinguishes this case from those where New Hampshire courts have rejected wrongful discharge claims premised on an employee's mere expression of disagreement with managerial or organizational decisions.  See, e.g., MacKenzie v. Linehan, 158 N.H. 476, 481 (2009) (deputy's disagreement with sheriff over whether deputy had violated department policy during a drunken off-duty encounter with a civilian); Short, 136 N.H. at 85 (educational consultant's disagreement with school board's criticism of the

24

superintendent).  Unlike in those (and similar) cases, Grivois's
wrongful discharge claim is not that public policy encouraged her
to disagree with her supervisors' decisions, but that public
policy encouraged her to inform her supervisors of her concerns
that those decisions endangered the safety of others.  Because a
rational jury could so find, the defendants' motion for summary
judgment is denied insofar as it argues that Grivois took no
action that public policy would encourage.

### b.  Causal connection

To prevail on her wrongful termination claim, Grivois must
prove not only that she engaged in acts that public policy would
encourage, but also that Wentworth-Douglass fired her because of
those acts.  See, e.g., Short, 136 N.H. at 85.  The defendants
argue that Grivois cannot create a genuine issue of fact as to
whether she was fired for raising concerns that the training and
staffing changes in the OR were jeopardizing patient safety.
Instead, they argue, the record permits only one conclusion as to
why Grivois was fired, i.e., her behavior toward Spracklin at the
meeting with Flanigan in November 2010.  The court disagrees.

First, and most importantly, the defendants ignore
substantial record evidence tending to show a causal connection
between Grivois's allegedly protected conduct and her firing,
viz., Spracklin's affidavit.  Spracklin attests that Hamill--who

25

ultimately made the decision to fire Grivois--"led [Spracklin] to believe that Ms. Grivois' complaints about the implementation of the POD system were just more examples of her disruptive behavior" and that Spracklin "should 'get rid of her.'" Spracklin also recalls that Hamill described Grivois as "trouble" due to her "reluctan[ce] to change" (as already discussed, Grivois testified that she had complained to Hamill in the spring of 2010, before Spracklin's arrival, that the change to the training requirement had endangered patient safety). This testimony suggests that Hamill wanted to fire Grivois for her complaints about changes to OR training and staffing procedures, i.e., the relaxed training requirements and the PODS system.

Second, the defendants assert that "neither Hamill nor Flanigan, the sole decision-makers with respect to Grivois'[s] termination, had received any complaints from [her] of any actual, direct or imminent threats to patient safety which [she] attributed to . . . changes in policy regarding staffing or training of OR staff." While that may be accurate as to Flanigan (a point the court need not decide at present), it is not accurate as to Hamill, as already discussed. See Part I.C.1.a, supra. So, while a plaintiff cannot recover on a wrongful discharge claim without proof that those involved in the decision to fire her knew of her allegedly protected acts, see Rowe v.

26

Liberty Mut. Ins. Co., 2013 DNH 168, 28-29, appeal docketed, No.
13-2506 (1st Cir. Dec. 10, 2013), Grivois has such proof here.

Third, though the defendants try to suggest otherwise, there
are material factual disputes as to Grivois's behavior toward
Spracklin at the meeting, and Spracklin's reaction to it.[8]  While
Flanigan recalls that Spracklin became visibly "flustered" as a
result of Grivois's tone and body language, Grivois maintains
that Spracklin "didn't seem flustered," and Spracklin herself
says that the discussion never became "heated" or
"argumentative."  Moreover, Grivois has testified that, after
Flanigan decided to end the meeting because it was "going
nowhere," Grivois asked Flanigan, "was I unprofessional in my
demanor to [Spracklin] at all?" and Flanigan said "no, you
weren't."  Yet Flanigan later decided to recommend to Hamill that
Grivois should be fired for the way she behaved toward Spracklin
in the meeting.

---

[8]The defendants also argue at length that Grivois has not
denied making the comments to Spracklin, earlier in November
2010, which, among other things, questioned her sexual
orientation.  As the defendants emphasize, however, Grivois was
not fired for making those comments (she was suspended), so her
"admission" that she did so is immaterial as to whether a genuine
dispute exists over why she was fired.  The defendants'
additional point that "[h]ad [Wentworth-Douglass] intended to use
[those] remarks to [Spracklin] as a pretextual reason to
terminate [Grivois], it would have [done] so" is, self-evidently,
just one permissible inference to draw from the sequence of
events leading up to her termination.

27

Viewing the record in the light most favorable to Grivois,
then, a rational jury could conclude that she did not in fact
behave unprofessionally or inappropriately toward Spracklin at
the November 20 meeting.  A finding that Grivois did not engage
in the behavior that her employer cited in firing her, of course,
raises a genuine issue of fact as to whether the real reason for
her termination was her protected activity--at least where, as
here, there is additional evidence to that effect, viz., Hamill's
statements to Spracklin.  Cf. Cook v. CTC Commc'ns Corp., 2007
DNH 132, 19-20 & 34-35 (denying summary judgment for defendant on
a wrongful termination claim based on evidence that, after
plaintiff raised concerns over company practices to the human
resources director, the human resources director told the CEO
that the plaintiff should be fired, which tended to show that the
stated reason for firing the plaintiff was pretextual).
The defendants are not entitled to summary judgment based on the
absence of a causal connection between Grivois's allegedly
protected acts and her termination.

### c.  Bad faith, retaliation, or malice

Finally, the defendants argue that no rational jury could
conclude that Grivois was terminated "out of bad faith, malice,
or retaliation," which she also must show to prevail on her
wrongful discharge claim.  Straughn, 250 F.3d at 44.  This

28

argument suffers from the same flaws as the defendants' challenge to Grivois's proof of a causal connection between her protected acts and her firing, and fails for essentially the same reasons.

Again, the defendants do not address Spracklin's testimony that Hamill had identified Grivois as a "disruptive" employee whom, based on her complaints about the PODS system, Spracklin should "just get rid of."[9]  Nor do the defendants address Grivois's version of her meeting with Spracklin and Flanigan, which, as just discussed, does not square with the reason the defendants have given for terminating Grivois--in that, among other things, Flanigan assured Grivois at the end of the meeting that she had not acted unprofessionally toward Spracklin.  As the defendants acknowledge, an inference of bad faith or malice can arise when "the record does not support the stated reason for the discharge." Id.  Accordingly, a reasonable jury could find that Wentworth-Douglass terminated Grivois out of bad faith,

_____

[9]Instead, the defendants argue at length that Grivois cannot show that she "was terminated for pursuing policies condoned by her employer," nor that she was subjected to "disparate treatment."  While "[b]ad faith or malice on the part of the employer may be established under New Hampshire law where an employee is discharged for pursuing policies condoned by the employer . . . or disparate treatment was administered to a similarly situated employee," Straughn, 250 F.3d at 44 (numbering omitted), those are not the only ways to show the bad faith or malice necessary to prevail on a wrongful termination claim.  To the contrary, "[b]ad faith or malice comes in various forms." Antonis v. Elecs. for Imaging, Inc., 2008 DNH 204, 7.

retaliation, or malice.  The defendants' motion for summary

judgment on the wrongful discharge claim is denied.

### 2.  Defamation

"Typically, a plaintiff proves defamation by showing that

the defendant failed to exercise reasonable care in publishing a

false and defamatory statement of fact about the plaintiff to a

third party, assuming no valid privilege applies to the

communication."  Thomas v. Tel. Publ'g Co., 155 N.H. 314, 321

(2007) (quotation marks omitted).  Grivois claims that Walker,

the Wentworth-Douglass CEO, defamed her when he told some of her

former colleagues that she had been fired because she "performed

a heinous act"--and, as noted above, one witness to Walker's

statement recalls that he said Grivois "performed a heinous

crime."  See note 5 and accompanying text, supra.  In moving for

summary judgment on that claim, the defendants argue that, as a

matter of law, Walker's statement was (a) not a statement of

fact, but an inactionable statement of opinion, (b) protected by

a qualified privilege, and (c) not the source of any recoverable

damages, in any event.  The court disagrees, and rules that

Grivois has presented a triable defamation claim.

First, even "[a] statement couched as an opinion . . . can

be actionable," so long as it "presents or implies the existence

30

of facts which are capable of being proven true or false."
Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 127 (1st
Cir. 1997) (applying Maine law); see also, e.g., Gray v. St.
Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000) (applying
New Hampshire law).  The defendants argue that Walker's statement
contains no such "objectively verifiable assertion."[10]

"Whether a given statement can be read as being or implying
an actionable statement of fact is itself a question of law to be
determined by the trial court in the first instance, considering
the context of the [statement] as a whole."  Nash v. Keene Publ'g
Corp., 127 N.H. 214, 219 (1985) (citation omitted).  Here, after
being asked by Grivois's former co-workers to explain why she had
been fired, Walker at first refused to discuss the subject, but
then said (at least according to the account of one witness) that

---

[10]The defendants premise this argument on their version of
Walker's statement, i.e., that Grivois "performed a heinous act."
Again, though, one witness gave a version of that statement which
is more favorable to Grivois's defamation claim, i.e., that she
"performed a heinous crime," and it is that version which this
court must accept in ruling on summary judgment.  See Part I.A,
supra.  Contrary to the defendants' suggestion at oral argument,
this court cannot disregard that account of Walker's statement
because, as they put it, that witness "has an agenda" (an
accusation which, this court suspects, fits many of the witnesses
here to one degree or another) or because the other witnesses to
Walker's statement recalled it differently.  "Of course, the
ground rules of summary judgment leave no room for credibility
determinations [and] no room for the measured weighing of
conflicting evidence."  Rodriguez v. Municip. of San Juan, 659
F.3d 168, 177 (1st Cir. 2011) (quotation marks omitted).

Grivois had "performed a heinous crime."  While a less literal reading is perhaps possible, this statement, on the face of it, amounts to factual assertion that Grivois had been fired for breaking the law in a serious way.[11]  Because "an average [listener] could reasonably understand [Walker's] statement as actionable defamation, then[,] there is an issue for the jury's determination, and summary judgment must be denied."  Id. at 220.

Second, the defendants have not even pointed to record evidence sufficient to support their qualified privilege argument, let alone shown that the evidence is undisputed on that point.  New Hampshire recognizes a qualified privilege for otherwise defamatory statements "if the facts, although untrue, were published on a lawful occasion, in good faith, for a

---

[11]It is also worth noting that, despite the defendants' argument that "[w]hether an act or statement performed by another individual is 'heinous' . . . cannot be objectively verified or disproved," they also assert that "Walker's characterization of [Grivois's] remarks [to Spracklin] was substantially true."  Obviously, a statement cannot be both objectively unverifiable and objectively true, and this inconsistency significantly hinders the defendants' attack on the defamation claim.  Cf. Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc., 2009 DNH 149, 28 (noting the inconsistency in defendants' arguments that allegedly fraudulent statements were both "inactionable puffery" and "accurate statements of historical fact").  Insofar as the defendants are arguing for summary judgment on the ground that Walker's statement was "substantially true," that argument is a non-starter, since there is no evidence that Grivois committed a crime of any severity, let alone that such a transgression played any role in her firing.

justifiable purpose, and with a belief, founded on reasonable
grounds of its truth, provided the statements are not made with
actual malice."  Simpkins v. Snow, 139 N.H. 735, 740 (1995)
(quotation marks omitted).  Here, among other shortcomings, the
defendants have not identified any evidence that Walker's
statement that Grivois was fired for a "heinous act" was "founded
on reasonable grounds of its truth."  To the contrary, the
defendants acknowledge that Walker believed--erroneously,
according to the undisputed record evidence--that Grivois "had
threatened to go public with the fact that her supervisor had an
alleged affair with a female employee at [her former]
institution, but that Walker "does not recall who told him that
Grivois had threatened to use the information against Spracklin."
Even on the defendants' version of the facts, then, there is a
genuine issue (at best) as to whether Walker's stated belief that
Grivois had been fired for a "heinous act" was "founded on
reasonable grounds of its truth," as necessary to support a
qualified privilege.

     Moreover, taking the facts in the light most favorable to
Grivois, there is no evidence that Walker could have reasonably
believed that Grivois was fired for a "heinous crime" because,
again, there is no evidence that he even believed Grivois had
done anything remotely illegal.  The defendants are not entitled

to summary judgment on this basis.  See Chamberlin v. 101 Realty, Inc., 626 F. Supp. 865, 871 (D.N.H. 1985) (denying defendant's motion for summary judgment on a defamation claim given a genuine issue as to "the existence of [his] good faith reasonable belief" in the accuracy of his defamatory statement).

Third, and finally, the defendants' argument that Grivois cannot prove that Walker's statement caused her any damages, even if accurate, is beside the point.  "When[,] as in this case, the factfinder could find that the defamatory [statement] charged the plaintiff with activities that would tend to injure him in his trade or business, commonly called libel per se, he can recover as general damages all damages that would normally result from such defamation, such as harm to his reputation.  He need not prove those damages specifically."  Lassonde v. Stanton, 157 N.H. 582, 592-93 (2008) (quotation marks, citation, ellipse, and bracketing by the court omitted).  Because a rational trier of fact could conclude that Walker's statement that Grivois had been fired from her job for "a heinous crime" accused her of an act that would tend to injure her in her chosen profession (the defendants do not argue otherwise), her inability to prove that the statement in fact caused such an injury does not prevent her from recovering in defamation.  See id.  The defendants' motion for summary judgment as to the defamation claim is denied.

34

**II. Amendment**

Grivois, for her part, has moved to amend her complaint to add four new claims:

> • a claim for defamation against Wentworth-Douglass, alleging that an as-yet unidentified employee falsely told Walker that Grivois had threatened to go public with information that Spracklin was gay;

> • a claim against Wentworth-Douglass for intentional infliction of emotional distress based on that same conduct;

> • a claim against Wentworth-Douglass for "negligent infliction of emotional distress" based on that same conduct; and

> • a claim against both defendants for "negligent infliction of emotional distress" based--like Grivois's existing defamation claim--on Walker's statement to the surgeons that Grivois had been fired for "doing something heinous."

The default rule governing a motion to amend a pleading, if more than 21 days have passed since it was filed, is Fed. R. Civ. P. 15(a)(2), which instructs the court to "freely give leave when justice so requires." Here, however, this court's scheduling order, entered when it approved the plan jointly submitted by the parties, set a deadline of January 15, 2013 for Grivois to amend her pleadings. Order of Aug. 16, 2012. Grivois did not file her motion to amend until October 11, 2013. Where a scheduling order sets a deadline for such amendments, and that deadline has passed when amendment is sought, "the liberal default rule is replaced by the more demanding 'good cause' standard of Fed. R. Civ. P.

16(b)," because allowing the amendment would amount to a de facto modification of the order. Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 1994). "This standard focuses on the diligence (or lack thereof) of the moving party more than it does on the prejudice to the party-opponent." Id. (footnote omitted).

While Grivois's motion does not explicitly address the applicable standard, she suggests that she acted diligently in moving to amend because the underlying facts "were not known by [her] until obtained at the depositions" of the four employees whom, at Walker's deposition, he identified as the only potential sources of his information that Grivois had been fired for threatening to publicize Spracklin's reputed homosexuality. It was at those depositions, Grivois explains, that each of the employees denied having said that to Walker. Thus, Grivois suggests, she could not have brought claims arising out of those employees' alleged statements to Walker until she had taken those employees' depositions.

The court does not follow this logic. Even on Grivois's version of events, it was at Walker's deposition that she first heard evidence that some other Wentworth-Douglass employee told him that she had been fired for threatening to publicize Spracklin's reputed homosexuality. So it was at that juncture that Grivois possessed the facts on which she relies for her

36

proposed new claims against Wentworth-Douglass, each of which asserts that the hospital is liable for the employee's statement under the doctrine of respondeat superior.  Yet Grivois did not seek to add those claims through her motion to amend until more than two months after Walker's deposition, which took place on August 2, 2013.

It is true that Grivois did not take some of the depositions of the four employees that Walker, at his deposition, identified as the potential source of the statement (Spracklin, Hamill, Flanigan, and Ellen Caille, the hospital's executive vice president) until later (though Caille's deposition actually took place the same day as Walker's, Flanigan, Hamill, and Spracklin who were deposed on August 8, August 19, and September 26, respectively).  According to Grivois, though, what she learned at those depositions was that each of the employees denied telling Walker that Grivois had been fired because she threatened to publicize the allegations about Spracklin's sexuality.  But that information undermines, rather than supports, Grivois's proposed new claims against Wentworth-Douglass.  So the court is at a loss to see how Grivois, having obtained Walker's testimony that one of four other employees had made a false statement to him as to why Grivois had been fired, needed to wait until each of those employees denied being the source of that statement before she

37

could bring claims against Wentworth-Douglass--rather than
against any individual employee--alleging the statement was
tortious.

Furthermore, Grivois does not even attempt to show good
cause for waiting until after she deposed all of those employees
to seek to add her claim for "negligent infliction of emotional
distress" against both defendants.  That proposed claim, as noted
at the outset of this section, is based not on what was said to
Walker, but on what Walker said to Grivois's former colleagues,
about why she had been fired.  That conduct, of course, is the
basis of Grivois's existing defamation claim--a claim that she
set out in her original complaint, filed at the commencement of
this action.  Grivois offers no reason why she did not include
her proposed "negligent infliction of emotional distress" claim
in her original complaint or, failing that, seek to add the claim
through a timely motion to amend.  While Grivois references
Walker's deposition testimony "that he did not in any way
investigate the truth or falsity of the alleged statement" by the
other employee (whoever she was), Grivois had already accused
Walker of speaking without exercising due care, since that is an
essential element the defamation claim set out in her original
complaint.  See Part I.C.2, supra.  Well before she took Walker's
deposition, then, Grivois had a factual basis for alleging that

38

Walker had spoken negligently when he attributed her firing to her commission of a "heinous crime."

In any event, as already noted, Grivois deposed Walker on August 2, yet did not file her motion to amend until October 11. Grivois does not explain this additional delay of more than two months, which resulted in her seeking to add four new claims to her complaint just ten days prior to the deadline for the defendants to move for summary judgment, which was October 21. This court has previously found that an unexplained delay of two and a half months, resulting in a motion to amend filed at the summary judgment deadline, "comes nowhere near the 'good cause' necessary to allow an amendment for which leave was not sought until eight months after the deadline set forth in the scheduling order." Contour Design, Inc. v. Chance Mold Steel Co., 2011 DNH 069, 22-23. The timeline here is quite similar--as is, more importantly, the unexplained nature of the delay--so the court comes to the same conclusion. This conclusion derives additional support from the fact that, in granting Grivois an extension of the deadline to disclose her expert witnesses (after she had let it pass months earlier without disclosing any), this court warned her counsel to "strictly comply with all future deadlines and expect no further indulgences." Order of Apr. 16, 2013. An unexplained delay of two months between coming into possession of

the information allegedly necessary to move to amend and actually
filing the motion to amend is inconsistent with that directive.
Because Grivois has failed to show the necessary "good cause" for
her untimely motion to amend, it is denied on that basis.[12]

## III. Exclusion of expert testimony

In addition to moving for summary judgment, the defendants
seek to exclude or limit testimony from three witnesses whom
Grivois has indicated will give expert testimony at trial:   Jack

_____

[12]Furthermore, at least as to the claims for negligent and
intentional infliction of emotional distress, the amendment
appears to be futile.  Of course, "futility is fully sufficient
to justify the denial of a motion to amend."  Hatch v. Dep't for
Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir.
2001).  Except in circumstances where a plaintiff witnesses the
defendant negligently causing physical injury to a close family
member, New Hampshire has not allowed recovery in negligence for
purely emotional harm.  See Palmer v. Nan King Rest., 147 N.H.
681, 683-84 (2002).  But Grivois's proposed negligence claims
allege only emotional distress.  The New Hampshire Supreme Court
has likewise limited recovery for intentional infliction of
emotional distress to conduct "so outrageous in character, and so
extreme in degree, as to go beyond all possible bounds of
decency, and to be regarded as atrocious, and utterly intolerable
in a civilized society."  Mikell v. Sch. Admin. Unit No. 33, 158
N.H. 723, 728-29 (2009) (quotation marks omitted).  The false
report to Walker that Grivois had been fired for threatening to
publicize Spracklin's reputed homosexuality does not meet this
formidable standard--indeed, the New Hampshire Supreme Court has
held that a teacher's "false report of misconduct [against a
student] in an effort to affect his disciplinary record and
eventually expel him" from school did not reach "the level of
extreme and outrageous conduct necessary."  Id. at 729.  Because
the amendment was untimely, however, the court need not decide
whether it was also futile.

Bopp, a vocational counselor; Phil Harford, a psychotherapist;
and Albert Drukteinis, a psychiatrist.  The defendants challenge
portions of this anticipated testimony as either improperly
disclosed under Rule 26 of the Federal Rules of Civil Procedure
or inadmissible under Rule 702 of the Federal Rules of Evidence.
For the reasons explained below, the court overrules those
objections, and denies the defendants' motion--except as to a
portion of a proffered opinion from Harford and the challenged
opinions from Bopp.

### A.    Improper disclosures

The scheduling order set a deadline of January 15, 2013, for
Grivois to disclose her expert witnesses.  Some two and one-half
months later, on April 1, 2013, Grivois filed a motion to extend
that deadline, acknowledging that she had "failed to disclose her
anticipated expert witnesses under the current discovery
deadline."  Grivois stated, however, that she had "anticipated
identifying" two expert witnesses, Bopp and Catharine Newick, an
economist, "from early in this litigation," because their
testimony was "essential to prove a significant portion of Ms.
Grivois' claimed damages."  The motion thus requested an
"extension of [the] discovery deadline for disclosure of
plaintiff's experts [to] June 1, 2013" (capitalization omitted).

41

This court subsequently granted the motion over the defendants'
objection, though "very reluctantly," and with a caution to
Grivois's counsel, as noted supra.  Order of Apr. 16, 2013.  The
court also granted the defendants' request, presented as an
alternative to denying Grivois's motion, to extend their deadline
to disclose experts until August 15, 2013.  Id.

Grivois served the defendants with a "preliminary expert
disclosure" identifying Bopp, Newick, and Drukteinis, as well as
a "hybrid witness disclosure" identifying Harford, on May 31,
2013--the day before the extended deadline.  The defendants argue
that the disclosures of Harford and Drukteinis were nevertheless
untimely because, unlike Bopp and Newick, they were not mentioned
in Grivois's motion to extend the expert disclosure deadline.  As
Grivois points out, however, her motion did not limit its request
for relief to an extension just so that she could disclose Bopp
and Newick.  Nor did the court limit the extension it granted to
the disclosure of Bopp and Newick.  While, as the basis for the
relief, the motion cited Grivois's intention to disclose Bopp and
Newick, the court declines to rule, from that fact alone, that
either the motion or the order granting it contained the
limitation now urged by the defendants--who, significantly, do
not claim that they were ever under the impression that any such

42

limitation was in effect.  Their motion to preclude testimony from Harford and Drukteinis as untimely disclosed is denied.

In the alternative, the defendants seek to limit the bases for Drukteinis's opinions to those disclosed in his expert report of May 31, 2013, to the exclusion of additional bases for his opinions set forth in a subsequent letter from Drukteinis, which counsel for the defendants did not see until August 5, 2013.  The letter states, in relevant part, that Drukteinis has "now also had the opportunity to review Ms. Grivois's deposition, interview her, and administer pyschological testing.  This new information does not change the opinions expressed in my earlier report of [May 30, 2013] and, in fact, supports those opinions."  The defendants argue that, insofar as this letter could serve to supplement Drukteinis's expert report, see Fed. R. Civ. P. 26(e), the supplementation is "untimely and improper."  The court disagrees on both counts.

While, oftentimes, the parties will propose a deadline in their discovery plan for the supplementation of expert reports, the parties here did not.  Their proposed plan, endorsed by the court, states simply that "[s]upplementations under Rule 26(e) are to be made seasonably pursuant to court rules."  Those rules provide, in relevant part, that "[f]or an expert whose report must be disclosed under Rule 26(a)(2)(B)," such as Drukteinis,

"the party's duty to supplement extends both to information included in the report and information given during the expert's deposition.  Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e)(2).  By rule, those disclosures are due 30 days before trial.  Fed. R. Civ. P. 26(a)(3)(B).  Here, the defendants received Drukteinis's letter on August 5, 2013, and trial is not scheduled to commence until March 4, 2013.  So the letter was not "untimely," at least as a matter of Rule 26(e)(2).

Nor was the letter "improper" under Rule 26(e)(1).  That rule requires a party to supplement a prior disclosure or discovery response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  As the defendants point out, courts have cautioned that this rule "'permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report.'"  Christensen v. Quinn, No. 10-4128, 2013 WL 2181102, at *2 (D.S.D. May 17, 2013) (quoting Minebea Co. v. Pabst, 231 F.R.D. 3, 6 (D.D.C. 2005)).  But that is exactly what Drukteinis's letter did.

44

Again, Drukteinis's letter noted that, since his initial
expert disclosure, he had interviewed Grivois, subjected her to
psychological testing, and reviewed her deposition.  Time records
that he attached to the letter show that he reviewed the
deposition and conducted the interview and testing in mid-July
2013, i.e., after the defendants received his original report on
May 31.  By disclosing those tasks in the letter, then, he was
"adding information not available at the time of the initial
report."  Id.  He also made the supplemental disclosure in a
"timely manner" under Rule 26(e)(2)(1)(A), i.e., less than three
weeks after he completed those tasks and, moreover, nearly two
months before discovery closed on October 1.

Furthermore, the defendants acknowledge that Drukteinis
"renders no new or different opinions" in the letter from those
set forth in his initial report, and they do not challenge the
adequacy of the bases for his opinions as they are set forth in
his initial report.  This is not a case, then, where a party is
using supplementation "to sandbag [its] opponent with claims and
issues which should have been included" in its expert's original
report, Beller ex rel. Beller v. United States, 221 F.R.D. 696,
702 (D.N.M. 2003) (quotation formatting omitted), or to provide
"a 'new and improved' expert report" that attempts to correct the

45

flaws that its adversary has identified, Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008).

At most, Drukteinis arguably ought to have interviewed and tested Grivois in time to incorporate the results into his initial report (he could not have reviewed her deposition before then, however, because it was not even taken until June 19).  But that failing, if it is one, would not support barring Drukteinis from relying on the interview and testing at trial.  At the time the defendants received the supplemental letter, they had yet to take Drukteinis's deposition--and still had plenty of time to do so, since there were nearly two months to go until discovery closed (and the scheduling order contained no separate deadline for expert discovery).  Ultimately, though, the defendants did not seek to depose Drukteinis.[13]  This is not a case, then, where a party did not learn that the opposing expert had conducted

---

[13]While the defendants say that they "chose not to incur the expense of deposing Drukteinis" due to "the limited scope of his inquiry" as reflected in his original report, they do not explain why they did not seek his deposition after learning, via the letter, that his inquiry had broadened--again, nearly two months of discovery remained at that point.  The defendants also point to the fact that, while Drukteinis has opined that Grivois suffers from depression, he has not disclosed an opinion linking that condition to her termination from Wentworth-Douglass.  If that is correct, then Drukteinis will not be able to offer such an opinion at trial (and this court will decide that at the appropriate time).  But it has nothing to do with whether the letter--which, as the defendants acknowledge, does not set forth any new opinions--complies with Rule 26(e).

post-report testing until his deposition, hampering counsel's
ability to conduct the deposition.  See MMG Ins. Co. v. Samsung
Elecs. Am., Inc., 293 F.R.D. 58, 61 (D.N.H. 2013).  Even if there
were some violation of Rule 26, it was harmless.  See Fed. R.
Civ. P. 37(c)(1); West v. Bell Helicopter Textron, Inc., 2013 DNH
118, 13-14.  The defendants' motion to limit Drukteinis's
testimony is denied.

### B.   Inadmissible opinions

Finally, the defendants seek to exclude certain opinions
disclosed by Harford and Bopp as inadmissible under Rule 702 of
the Federal Rules of Evidence.  Under that rule,

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is
> based upon sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods
> reliably to the facts of the case.

The defendants argue that several of Harford's opinions (and one
of Bopp's) are inadmissible under this rule because, variously,
they will not assist the trier of fact, they are not based on
reliable principles and methods, and the witness is unqualified
to give them.  While the court agrees as to Bopp's challenged
opinion, it disagrees (with one exception) as to Harford's.

47

###### 1.   Harford

Harford is a licensed clinical social worker who practices as a psychotherapist.  He began treating Grivois in March 2013 and, since then, has conducted approximately 64 counseling sessions with her.  Harford has diagnosed Grivois with major depressive order.  While he had also diagnosed her with post-traumatic stress disorder ("PTSD"), as stated in his original expert report, he later revised his report to indicate that she did not meet the accepted diagnostic criteria for that condition, though she displayed symptoms of it.  The defendants argue, then, that "Harford should be precluded from testifying that Grivois has PTSD."

In response, Grivois states that Harford will not testify that she has PTSD, but "will testify that she has PTSD-like symptoms."  In the court's view, however, the potential for that testimony to confuse the jury substantially outweighs any probative value it has.  See Fed. R. Evid. 403.  While Harford can testify to Grivois's symptoms as he has noted them, he cannot testify that they are "PTSD-like" when he acknowledges that she does not in fact have PTSD.

The defendants further argue that Harford cannot testify that Grivois has major depressive order, because that diagnosis "was necessarily based on [her] self-report of 'a depressed and

48

anxious mood,'" rather than "psychological tests" (though they
also acknowledge, two sentences later, that Harford performed
"limited testing . . . based on what Grivois told him"), or any
"other records."  So far as this court is aware, however, a
trained psychotherapist can diagnose depressive disorder based
solely on a patient's in-person reports; the defendants provide
no evidence or authority to the contrary.  The jury will make its
own assessment of the reports Grivois gave Harford (informed, of
course, by its assessment of her credibility as a trial witness)
and if it does not find them credible, can discount his opinions
accordingly.  But that possibility goes to the opinions' weight,
not their admissibility.  See, e.g., Newell P.R. v. Rubbermaid,
Inc., 20 F.3d 15, 20 (1st Cir. 1994).  Harford can testify to his
opinion that Grivois suffers from major depressive order.

          The defendants also challenge Harford's opinion as to the
cause of Grivois's depressive disorder.  In his expert report,
Harford states his "clinical observation that the involuntary
loss of her employment was one of a number of events that
contributed significantly to Ms. Grivois's depression."  The
other recent events, as also identified in Harford's reports,
were "the death of her parents and her sister and the unexpected
discord she observed among her surviving siblings," and "a
painful loss involving the euthanasia of her two horses."  The

49

defendants argue that Harford is no "more qualified than the
average juror to determine whether, and to what extent, one or
more of the recent stressors in Grivois' life contributed to
[her] emotional distress." Harford is, however, a practicing
psychotherapist, and one of the roles of a psychotherapist is to
assist patients in managing the symptoms of their psychological
disorders by identifying the origins of those symptoms. The
court sees nothing to suggest that Harford departed from reliable
methods of psychotherapy in attributing Grivois's depression, in
part, to her termination from Wentworth-Douglass.

While the defendants are correct that the causal connection
(if any) between Grivois's termination and her alleged emotional
distress is ultimately for the jury to decide, that does not
itself render Harford's causation opinion inadmissible, because
"the bar on 'ultimate issue' opinions has been abolished in civil
cases." Dinco v. Dylex Ltd., 111 F.3d 964, 973 (1st Cir. 1997)
(citing Fed. R. Evid. 704(a)). This does not provide "carte
blanche for experts to substitute their views for matters well
within the ken of the jury," id., but that is not a fair
characterization of what Harford would be doing by testifying
that Grivois's termination "was one of a number of events that
contributed significantly to [her] depression." Indeed, expert
opinion testimony attributing a plaintiff's emotional disorder to

a defendant's allegedly tortious conduct is commonly allowed, so long as it meets the requirements of Rule 702.  See, e.g., West, 2013 DNH 118, 14.  Harford's opinions as to Grivois's depression and its causes meet those requirements, so far as the court can tell from the record and arguments before it at present.  The defendants' motion to exclude those opinions is denied, without prejudice to revisiting their objections at trial.

### 2.  **Bopp**

The defendants direct their sole challenge to Bopp's disclosed opinions at his statements in his report that (1) "there exists a 'grapevine' among hospitals and medical practices within the state and I suspect the story of Ms. Grivois' discharge circulated among professionals in the local medical industry" and (2) her "involuntary termination . . . is perceived negatively by most of the prospective employers she has contacted and I suspect that it has lead [*sic*] prospective employers to decide against considering her."  The court agrees with the defendants that these statements, at least as they are presented in Bopp's report, are speculation--as indicated by his use of the phrase "I suspect"--rather than opinions based on reliable principles and methods.  The defendants' motion to preclude Bopp from making such statements at trial is granted. See Fed. R. Evid. 702.  This ruling is not intended to prohibit

51

Bopp from giving other opinions as to the likelihood of Grivois's finding future employment following her termination, so long as those opinions are properly disclosed and otherwise admissible.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the defendants' motion to exclude or limit the opinions of Grivois's experts[14] is GRANTED in part and DENIED in part, as fully discussed above; Grivois's motion to amend[15] is DENIED; and the defendants' motion for summary judgment[13] is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  January 28, 2014

cc:  John G. Vanacore, Esq.
     Debra Weiss Ford, Esq.

_____

[14]Document no. 22.

[15]Document no. 26.

[13]Document no. 29.